NAO5WANC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

                    v.                       23 Cr. 302 (PGG)

QINGZOU WANG,
YIYI CHEN,

                    Defendants.

------------------------------x

                                             October 24, 2023
                                             10:20 a.m.

Before:

                    HON. PAUL G. GARDEPHE,

                                             U.S. District Judge


                         APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:   KEVIN T. SULLIVAN
      ALEXANDER LI
      Assistant United States Attorneys

ARSHACK, HAJEK & LEHRMAN PLLC
     Attorneys for Defendant Wang
BY: DANIEL N. ARSHACK

KIRTON LAW FIRM
     Attorneys for Defendant Chen
BY: MARLON G. KIRTON
          -and-
BY: SHAOMING CHENG


ALSO PRESENT:  UNA WILKINSON, Mandarin Interpreter

NAO5WANC

(Case called)

THE DEPUTY CLERK:  Counsel for the government, please state your appearances.

MR. SULLIVAN:  Good morning, your Honor.  Kevin Sullivan and Alexander Li on behalf of the government.

THE DEPUTY CLERK:  Counsel for defendant, please state your appearances.

MR. ARSHACK:  Daniel Arshack on behalf of Mr. Wang.

MR. KIRTON:  Marlon Kirton and Shaoming Cheng for Ms. Chen.

THE COURT:  All right.  We were last together on August 24th.  At that time the parties reported to me on the status of discovery.  The government represented that discovery was largely complete other than as to the defendants' electronic devices, specifically four phones, a laptop, and hard drive.  The government reported that it had not been able to access these devices but was continuing to make efforts to do so.  There was discussion about the defendants' access to the discovery materials.  The government represented that it wanted to assist in access to discovery at the MDC.  There was a discussion about when it would be appropriate to set a motion schedule.  I expressed a desire to set a motion schedule and trial date at the next conference in the case which I scheduled for today.

So, shall we will begin by hearing a report from the

NAO5WANC

government as to the current status of discovery?

MR. SULLIVAN:  Yes, your Honor.

So, currently those four devices, four phones, and laptop, as your Honor may recall, that hard drive was actually mistakenly categorized as a hard drive, it was in fact a battery pack of some kind.

THE COURT:  OK.

MR. SULLIVAN:  We are still making efforts to get into them, those efforts are under way.  We don't hold that much hope for the laptop given what we know about it but that effort is still under way right now.

THE COURT:  And where are we in terms of assisting defendants in terms of getting access to the discovery that's been produced, to date?

MR. SULLIVAN:  Yes, your Honor.  So discovery has been sent to MDC.  We are obviously in receipt of Mr. Kirton's letter from this morning and we can address that right now.

THE COURT:  Please do.

MR. SULLIVAN:  Yes, your Honor.

Essentially, how MDC works is that when there is a protective order, the defendant is not given the drive to have and keep on their person and to freely access, at will.  What we then did, upon hearing of the issues that Ms. Chen in particular was having with respect to access to the drive, is we made a request that she be authorized to keep the drive on

NAO5WANC

her person.  This was after some back and forth with Mr. Kirton from around mid-September through October 3rd when we made that request to MDC.  We understand from MDC that shortly after we requested that the drive be authorized for her to be kept on her person, that that authorization was given and that she was given access to the drive.  Now, Ms. Chen is in an open unit as a female inmate at MDC.  She is not confined to a cell.  There are computer terminals on the unit and she can use those terminals to access the contents of the drive that's now on her person.  And so, we believe that should have cleared up access to the discovery.

We obviously see, in Mr. Kirton's letter this morning, the request for a laptop.  We do object to that but also want to raise some practical considerations.  We asked MDC about how that would work and, as we understand it, that might make it a little more difficult because the laptop is not given to her to be kept on her person at all times, she actually has to request the laptop be given to her, that requires staff resources to go and get the laptop and for her then to use it.  And so, if there is a constraint on staffing due to any kind of security event in the prison, that could lead to delay.  So, we do think the fact that if the drive is on her person with computer terminals on her floor, that she can freely access that, this is the most practical way to move forward and assure that she has access to the discovery.

NAO5WANC

THE COURT:  Have you spoken with Mr. Kirton about whether she's having a problem accessing the terminals that are in her unit?

MR. SULLIVAN:  So we updated Mr. Kirton on what we understand to be the layout in her unit upon seeing his letter. He said that he would confer with his client.  We don't have a further update as to whether she has in fact been able to more recently access those terminals and hook up the drive.

THE COURT:  Mr. Kirton, can you speak to that issue, please?

MR. KIRTON:  Yes, your Honor.  Good morning.

My client is in a unit with about 100 other female inmates.  She has some trouble getting access to the unit computers.  In addition to that, there is absolutely no privacy for anyone that does have access to those unit computers and all the discovery is on her drive, all the inmates would have access to viewing her discovery when she is on a computer terminal.  So, we have two issues; one is one of privacy which may or may not be an issue, but I think that the larger issue is whether or not she is going to have actual access to the computer units at all.

THE COURT:  Do you know how many terminals there are?

MR. KIRTON:  One moment, your Honor.  Sorry.

(Defendant and counsel conferring)

MR. KIRTON:  There are six computer units but I

NAO5WANC

believe only one of those computer units is for discovery. There are over 100 inmates in her particular area. That's my information, your Honor. The government may have more detailed information about that but that's the information that I have in terms of her access to the unit discovery computers.

THE COURT: What do you say?

MR. SULLIVAN: So we don't know precisely how many computers are on the floor. We can inquire and inquire how many of them are intended for discovery.

THE COURT: Well, let me say this. There is more information that we need to have but if the situation is as Mr. Kirton described or anything close to that, it is hard to see how one terminal available for 100 inmates is going to be adequate to permit Ms. Chen to review the discovery. So, we have got to get to the bottom of what her access is going to be, what the resources are in the unit, if the resources are not adequate, whether the laptop is a feasible alternative, and we have to get to the bottom of it quickly. So, I'm going to ask the lawyers to send me a joint letter in a week's time telling me what they've been able to learn with respect to computer resources available to Ms. Chen in the unit and how they propose to resolve the issue of access so that she can have an opportunity to review the discovery.

Before we leave, Ms. Chen, Mr. Kirton, you have also raised an issue about commissary. I gather that there was a

NAO5WANC

commissary account for your client when she was in Honolulu, in transit, and in your letter you say that she hasn't been able to get access to funds in her commissary since she arrived here.  Is that still an active issue?

MR. KIRTON:  I spoke to the government this morning. Apparently that issue has been resolved.

THE COURT:  OK.

MR. KIRTON:  But I have to confirm that with my client, but according to the government the $300 was transferred I think earlier this week.

THE COURT:  OK.

MR. KIRTON:  But she still does not have her personal property; that is still in transit, or lost, or I'm not sure where it is.

THE COURT:  Have you spoken to the government about the personal property issue?

MR. KIRTON:  Yes, I did this morning.

THE COURT:  All right.  And you will check into that?

MR. SULLIVAN:  Yes, your Honor.

We understand from MDC that they believe the personal property was transferred and then when they went to confirm this morning she was obviously already in court.  They believe it has been transferred.  We will follow up.

THE COURT:  Thank you.

I have also received a letter from Mr. Arshack on

NAO5WANC

behalf of Mr. Wang.  The principal issue set forth in Mr. Arshack's letter is one of transcripts of recordings that were made in connection with the investigation.  As I understand it, the recordings are in multiple languages including Spanish, English, and Mandarin.  According to Mr. Arshack, his client does not speak English.  With respect to the portions of the recordings that are in Mandarin, Mr. Arshack does not speak Mandarin.  So there is a variety of issues with respect to transcripts so let me hear from the government about what's going on with respect to transcripts of the recordings.

MR. SULLIVAN:  Yes, your Honor.

So I will begin by just putting some flesh on the numbers that were cited in Mr. Arshack's letter.  Mr. Arshack's letter cites some 15-odd hours of recordings, whether audio or video.  To be clear, the vast majority of those recordings, the substance is in English.  What is interspersed throughout some of them are portions and exchanges that are in Mandarin.  And what we have done is we have gone through the recordings and tallied up what portions are in fact in a foreign language, and approximately an hour and 37 minutes are in Mandarin and approximately less than four minutes are in Spanish.  And this was, in part, an effort to then get the recordings sent out for translation.  What has been done, to date, is the government has provided draft summary translations for these recordings

NAO5WANC

that reflect the general content of the foreign language exchanges.  In some instances they do reflect precise wording and phrasing of those foreign language exchanges.

One other point I did just want to draw attention to, I believe Mr. Arshack had noted that there were multiple duplicative recordings.  What that is simply a function of is for various of the undercover meets that happened with CSs in the case multiple cameras were used, multiple recording devices.  That's the only reason for that.  So, what we have done with the hour and 37 minutes of Mandarin is we have obtained a quote to have it translated by an outside translation service, we have obtained approval for the funding for that and assuming the funding lasts, given the upcoming November 17 budget deadline, we have been told that we can expect completion of the translation of that hour and 37 minutes in mid to late November.  What we have asked in the interim is as transcripts are ready, that we receive them, and then we would produce them on a rolling basis to the defense.

THE COURT:  What's the plan with respect to the Spanish which seems to be quite limited?

MR. SULLIVAN:  It is quite limited, it's less than four minutes, approximately.  Right now we don't have any intention of obtaining a verbatim translation.  We could produce a draft transcript probably with internal resources. We have informed defense counsel that the exchange is fairly

NAO5WANC

non-substantive, it is two Spanish CSs having brief words, and it was frankly for the purpose of reflecting that one is the boss of the other in a deal that's being discussed on that particular recording.

THE COURT:  So, Mr. Arshack, it sounds like the vast majority of the material is in English.

MR. ARSHACK:  That certainly is of course helpful for me so that we can review that.  What that leaves is the vast majority unavailable to my client and it's, at the moment, a bit of a mystery as to how we are going to accomplish him understanding what's on the rest of those tapes, the expense of either an interpreter being present and going through them in real-time with him or having them actually translated and a transcript generated for him is significant.  One way or another we are going to have to put my client in a position to understand what's on those tapes and how it relates to him and the position that he has in this case.

THE COURT:  Have you spoken with the government about how this problem is going to get resolved?

MR. ARSHACK:  Well, we spoke briefly this morning but we don't really have a resolution on that aspect.  It is my take-away, and I am happy to have him correct me if I took away the wrong conclusion, is that the English to Mandarin issues is something that they're not inclined to address.

THE COURT:  OK.  I will hear from the government.

NAO5WANC

MR. SULLIVAN:  So, yes, your Honor, with respect to the English to Mandarin translation, if Mr. Arshack believes it is in his client's interest and that for the purpose of his representation of his client needs to have English translations, he is of course free to pursue that on his own but in terms of the government obtaining the funding to do that we have no intention.

MR. ARSHACK:  I'm sorry, Judge.  I can't hear.

MR. SULLIVAN:  I'm sorry.  I was saying that if Mr. Arshack believes that his client should have the English to Mandarin translations of those English portions, that's of course something he is free to pursue.  The government does not have any intention, right now, of obtaining the funding to undertake that for Mr. Arshack or his client.

THE COURT:  Can you give me a sense of the number of hours that we are talking about here?

MR. SULLIVAN:  So in terms of the overall recordings, obviously Mr. Arshack's letter cites some 15 hours of recordings and noting that there are duplicates.  I don't have a precise number but if you just give me one moment to confer with co-counsel?

(Counsel conferring)

MR. SULLIVAN:  So, your Honor, our sort of the back of the envelope rough estimate is under six hours is the net time of recordings that are at issue.

NAO5WANC

THE COURT:  And that would be six hours of English; right?

MR. SULLIVAN:  I'm sorry.  That's six hours total, approximately an hour and 40 minutes of which are in a foreign language which we are taking the translations from.

THE COURT:  So roughly four hours and 20 minutes, roughly, of English; right?

MR. SULLIVAN:  That's correct; approximately, your Honor; yes.

THE COURT:  With respect to the English language conversations, who are those between?

MR. SULLIVAN:  Yes, your Honor.  So they are between any number of the CSs and the co-conspirator, the third -- the fourth defendant on the indictment "Anita" or Er yang, and so those are shown in video calls over WhatsApp.  And then there are the Bangkok meeting which was a meeting with one of the CSs and these two defendants, and then there is the Fiji meeting also with the same CS and these two defendants, and then there are two video calls with these two defendants and a number of the CSs, one in April and another in May.

THE COURT:  And did Mr. Wang, is it the government's position that Mr. Wang participated?  Did he speak?

MR. SULLIVAN:  So Mr. Wang participated in obviously the Bangkok meeting, the Fiji meeting, the April call and the May call, and he actively participated.  Because Ms. Chen knows

NAO5WANC

English she was providing the translation from the CS to Mr. Wang and reporting back what Mr. Wang was then wanting to convey to the CS in terms of the deal that they were discussing.

THE COURT:  Now, her translation to him at the time, that's on the video; right?

MR. SULLIVAN:  That's on the video; yes, your Honor.

THE COURT:  All right.  So, Mr. Arshack, it seems that if you believe that it's necessary to have the four hours and 20 minutes of English translated for your client for purpose of these proceedings that you are going to have to make arrangements to do that.

MR. ARSHACK:  Thank you, Judge.  My belief, actually, is that it is significantly longer than that but let's not quibble over that at the moment.

By my eyes, Judge, the issue that really resolves this is the government letting us know what portion of these recordings are going to be introduced as exhibits in the case. If most of them are irrelevant or unrelated, then we have a far lighter lift than a different position. My guess is, Judge, that a very small amount of this is actually going to be introduced in this case.

THE COURT:  I had been thinking the same thing but often defense lawyers want it all translated anyway because what the government thinks is important the defense may think

NAO5WANC

other things are important.  So I wasn't sure that was going to be productive but if you think it is going to be productive --

MR. ARSHACK:  I do.

THE COURT:  -- let me explore that with the government.

What do you say?  Is there any way you could narrow this down so that whatever the materials has to be translated it is something under four hours and 20 minutes?

MR. SULLIVAN:  Yes, your Honor.  I mean, I think what the defense is effectively asking for is that without a motion schedule set, without a trial date set, that we essentially preview some portion of our exhibits in the form of these recordings and identify which we would intend to offer at trial.  That's of course extremely premature.  We did look at some case law on this.  The government, even with a trial date set and significantly closer to trial in terms of a matter of weeks, has no obligation to do that.

I would point out that Mr. Arshack's client was present for all of these recordings.  He knew what was being discussed, he knew what he, what his exchanges with Ms. Chen contained, and it's not like Mr. Arshack is without any guidance as to the content of these recordings or what he might, in particular, want to put in front of his client to put to him or ask him questions about or to prepare for eventual motions down the road.  In terms of the four hours and 20

NAO5WANC

minutes, at this stage telling defense what we would intend to offer at trial, we think, is extremely premature.

THE COURT: Well, I tend to disagree with you. We have a practical problem here and it's one that comes up in lots of cases and, actually, the universe that we are talking about is much smaller than what I anticipated. I mean, there are cases with hundreds of hours of recordings and it's not practical to say we are not going to assist the defense in focusing on what is relevant here in a context where the alternative is to experience months of delay while these recordings, which may include large amounts of completely irrelevant material are translated at great expense. So, this is not a novel problem, it comes up in the context of recordings, it comes up in the context of electronically stored information all the time and the defense says, you know, it would be very helpful to me in terms of advising my client if the government could sit down with me and identify the portions of the material that are actually relevant and that is done routinely because it's really the only practical way in the world that we live in where often there is massive amounts of electronically stored information and it would take years for the defense to muddle through it and try to find the wheat buried in the chaff, so I think what Mr. Arshack is suggesting is a practical approach.

So, how can we avoid months of delay here or is there

NAO5WANC

a way to avoid months of delay here?  Is there a way we can cut down the four hours and 20 minutes and try to focus on what really matters?  Now, he isn't suggesting that the government is going to be bound by whatever it is they identify as something that defense counsel may want to focus on.  The government is not going to be precluded here, it is just an effort to try to cut through what could otherwise delay the case.  And so, the government is not going to be prejudiced by this exercise, it is not going to be precluded from offering the other parts of the recordings, but it is an effort to assist the defense in focusing on what's relevant in the recordings.  That's all.  So, given that the vast majority of the material is in English and we have such a small amount that's in foreign languages, frankly, this really seems like something the lawyers should be able to work out.  It is not a massive problem.

MR. SULLIVAN:  Your Honor, if I may?

What I heard Mr. Arshack's request to be was that we identify what we intended to introduce at trial.  We are talking about the larger universe of what is relevant.  Well, yes, your Honor, it is a small volume of recordings.  We turned it over in the course of Rule 16.  It is all relevant.  The speaking indictment that the government filed in this case does sort of walk through each instance of communications; the two undercover meets, the two substantive calls, and then the

NAO5WANC

number of exchanges that occurred with one or more of the CSs and that fourth defendant Er Yang.  And so, there is that sort of guide, if you will, for those four hours.  We would contend it is all relevant, it is discussed in detail in the indictment.

Another thing, your Honor, the draft summary translations do provide an overview, a very quick summary overview so that defense counsel isn't reviewing four hours and 20 minutes of English translations.  Now, if the defense's objection is that it doesn't want to have to sift through itself, as counsel, four hours and 20 minutes of translations, I'm not sure what the government can necessarily do about that but we have tried to provide the draft summary translations.  We would contend if we are not talking about a request to identify what we intend to introduce at trial but simply a request to identify what is relevant, we would contend that those four hours and 20 minutes are relevant, that the speaking indictment does walk through most of the discrete communications leading up to these defendants' arrests including the two meetings, the two video calls, and a number of other communications.  I'm not sure how much more specific we can get in terms of what within the calls is relevant.  As I said, the draft summary translations do get at that in a more efficient way.  We are happy to continue to discuss with defense counsel, but at some point I think counsel does need to

NAO5WANC

actually, with the four hours and 20 minutes of English, listen to it.

THE COURT:  What do you say, Mr. Arshack?  Is there some reason why you can't listen to the four hours and 20 minutes that are in a language that you understand?

MR. ARSHACK:  Right.  Well, the issue is less about my listening to it than my client understanding what's on that.

THE COURT:  Well, that I understand, but it seems to me that you understand English, you can listen to the tapes and you can make your own decision about what is important for your client to have translated for them.  I mean, the assistant is correct that it is a speaking indictment, there is an awful lot of information in the indictment about the negotiations and the meetings that took place and what was said.  I gather that there are summaries -- I haven't seen the summaries, I don't know, I have no idea what the summaries look like -- but the assistant has represented there is summaries of conversations which could help you in your review of the four hours and 20 minutes.  So, with respect to the English, it seems to me that you have the tools of available to make your own determination about what is necessary for that, the English to be translated into Mandarin.  Maybe your decision is that it all has to be translated.  I don't know.  But I'm not sure that the government can meaningfully help you decide what, in the four hours and 20 minutes of English, should be translated into

Mandarin for your client.  I think that is probably a decision that you are going to have to make.

With respect to the Mandarin, which actually is what I thought the problem was going to be about because you don't understand Mandarin and so I thought where this was headed is that you wanted the government to help you with deciding what in the Mandarin it might be necessary to have translated for your use, but we took a different -- we veered off into a different direction.

But, anyway, with respect to the translations, either of the English into Mandarin or Mandarin into English, I think, Mr. Arshack, you are going to have to decide what's necessary in that respect in order for you to effectively represent your client.  And so the question is, given that the government has represented that the Mandarin will be translated in its entirety by mid to late November and will be provided on a rolling basis as translations are done, given that, given your need to review the four hours and 20 minutes of English, when do you think you are going to be in a position to tell me what might be an appropriate motion schedule in this case?

MR. ARSHACK:  I had expected that our conversation today would boil down to that question and I am asking for a date in early January, Judge.

THE COURT:  OK.  Mr. Kirton, do you wish to be heard on the point?

NAO5WANC

MR. KIRTON:  I have no objection, your Honor.  Our view is that the Court should consider setting the motion schedule for the first quarter of next year and the trial date for the second quarter of next year.  That position is unchanged but we are still working through these issues so I think we need some time.

THE COURT:  All right.  So this is what I am going to do.  I'm going to put the case down for conference in early January.  It is my expectation that we will set both a motion schedule and a trial date at the next conference.  If there are problems, if there are issues that arise with respect to discovery, with respect to this transcript issue, with respect to anything that would interfere with the setting of a motion schedule and a trial date in early January, please, let me know so we can have another conference and discuss how we are going to resolve these issues.

I can offer you January 9 at 10:00 a.m.

MR. KIRTON:  Your Honor, I'm sorry.  I have a trial scheduled in this district on January the 8th.  I don't know if it is possible to have it the week before that at all?

THE COURT:  We will accommodate you, Mr. Kirton.

MR. ARSHACK:  I will be out the week before that.

THE COURT:  Oh.

MR. KIRTON:  Well, I think we will make arrangements to have -- if the Court sets a date the week of January the

NAO5WANC

8th, I am sure I can make arrangements to either be here myself --

THE COURT:  Could we do it at lunchtime?

MR. KIRTON:  Yes.  It is before --

THE COURT:  We can do it at lunch time.

MR. KIRTON:  It is across the street, so that's fine.

THE COURT:  So maybe 12:30?

MR. KIRTON:  That's fine, your Honor.

THE COURT:  Can we do 12:30, Mike, January 9?

THE DEPUTY CLERK:  Yes, your Honor.

THE COURT:  That's OK with you, Mr. Arshack?

MR. ARSHACK:  Yes, your Honor.

THE COURT:  So our next conference will be January 9 at 12:30.  Does the government wish me to exclude time between then and now?

MR. SULLIVAN:  Yes, your Honor.

The government respectfully requests to exclude time under 18 U.S.C. 3161(h)(7)(A) so that the parties can continue to resolve the Mandarin translation issue, the government can roll out translations as we receive them throughout November, any remaining discovery with respect to devices can be produced, and defense counsel can assess what motions are to be made on their clients' behalf.

THE COURT:  Is there any objection to the exclusion of time through January 9?

NAO5WANC

MR. ARSHACK:  No.

MR. KIRTON:  No objection.

THE COURT:  I will exclude time between today and January 9, 2024 under the Speedy Trial Act pursuant to Title 18, United States Code, Section 3161(h)(7)(A) to permit the government to continue to make discovery available to the defendants, to permit the defendants to review the discovery, to resolve the transcript issue that we have been talking about today, and for the defense lawyers to determine what pretrial motions would be filed in this case.  I do find that the ends of justice served by the granting of this continuance outweigh the best interests of the public and the defendants in a speedy trial.

Mr. Sullivan, anything else on behalf of the government?

MR. SULLIVAN:  No, your Honor.  Thank you.

THE COURT:  Mr. Arshack, anything?

MR. ARSHACK:  Nothing.  Thank you, Judge.

THE COURT:  Mr. Kirton?

MR. KIRTON:  No, your Honor.  Thank you.

THE COURT:  Thank you, all.  Good day.

o0o