OBI4HUMC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

              v.                                23 Cr. 302 (PGG)

HUBEI AMARVEL BIOTECH CO. LTD.
*et al.*,

                                        Conference

          Defendants.

------------------------------x

                                     New York, N.Y.
                                     November 18, 2024
                                     3:10 p.m.

Before:

                    HON. PAUL G. GARDEPHE,

                                     District Judge

                      APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
KEVIN SULLIVAN
     Assistant United States Attorney

LEONARDO M. ALDRIDGE
DAVID MOU
     Attorneys for Defendant QINGZHOU WANG

MARLON G. KIRTON
     Attorney for Defendant YIYI CHEN

Also Present:

Lily Lau, Interpreter

OBI4HUMC

1        (Case called)

2        MR. SULLIVAN:  Kevin Sullivan on behalf of the

3    government.

4        MR. ALDRIDGE:  Good afternoon, your Honor.  This is

5    court-appointed counsel Leo Aldridge on behalf of Mr. Wang,

6    also representing him is co-counsel David Mou.

7        MR. MOU:  Good afternoon, your Honor.

8        MR. KIRTON:  Marlon Kirton for Ms. Chen.  Good

9    afternoon.

10        THE COURT:  Good afternoon.

11        I understand that there has been a superseding

12    indictment so it's necessary for me to arraign the defendants

13    on that.

14        I further understand that the superseding indictment

15    is nearly identical to the original indictment, but,

16    nonetheless, we have to proceed with an arraignment.

17        Mr. Wang, you are here with Mr. Aldridge as your

18    attorney; is that correct?

19        DEFENDANT WANG:  Yes.

20        THE COURT:  And Ms. Chen, you are here with Mr. Kirton

21    as your attorney; is that correct?

22        DEFENDANT CHEN:  Yes.

23        THE COURT:  Mr. Wang, and Ms. Chen, have each of you

24    received a copy of the superseding indictment which reflects

25    the charges against you?  Mr. Wang?

OBI4HUMC

1        DEFENDANT WANG:  Yes.

2        THE COURT:  And Ms. Chen?

3        DEFENDANT CHEN:  Yes.

4        THE COURT:  And has the superseding indictment been

5    read to you in Mandarin, Mr. Wang?

6        DEFENDANT WANG:  Yes.

7        THE COURT:  And Ms. Chen?

8        DEFENDANT CHEN:  Yes.

9        THE COURT:  And have each of you discussed the

10   superseding indictment with your attorney, Mr. Wang?

11       DEFENDANT WANG:  Yes.

12       THE COURT:  Ms. Chen.

13       DEFENDANT CHEN:  Yes.

14       THE COURT:  You should understand in Count One of the

15   superseding indictment you are charged with violating 21,

16   United States Code, Section 846, which prohibits conspiring to

17   traffic in fentanyl.

18       Count Two charges you with violating United States

19   Code, Section 963 which prohibits conspiring to import

20   fentanyl-precursor chemicals with the intention to manufacturer

21   fentanyl.

22       Count Three charges you with violating 21, United

23   States Code, Section 959(a), which prohibits importing

24   fentanyl-precursor chemicals into the United States with the

25   intent to manufacture fentanyl.

OBI4HUMC

1              Count Four charges you with violating 21, United

2     States Code, Section 959(a), which prohibits importing

3     methamphetamine-precursor chemicals into the United States.

4              Count Five charges you with violating, 18, United

5     States Code, Sections 1956(f) and 1956(h), which prohibits

6     conspiring to commit money laundering.

7              Do each of you understand that these are the charges

8     against you in the superseding indictment?

9              MR. KIRTON:  Your Honor, if I may I don't believe my

10    client is charged with all five counts in the indictment.  I

11    don't believe she is charged in Count Four.  You can correct me

12    if I'm wrong.

13             THE COURT:  Is that true, Mr. Sullivan?

14             MR. SULLIVAN:  Yes, your Honor, I'm just

15    double-checking.  Yes, not Count Four and not Count Three.

16             THE COURT:  All right.  So Ms. Chen, you are not

17    charged in Counts Three and Four.  You are charged in the other

18    three counts that I discussed.  Do you understand that?

19             DEFENDANT CHEN:  Yes.

20             THE COURT:  All right.

21             Do either of you wish me to read the superseding

22    indictment to you now here in open court, Mr. Wang?

23             DEFENDANT WANG:  Not necessary.  Thank you.

24             THE COURT:  Ms. Chen, do you want me to read the

25    indictment to you now, here in open court?

OBI4HUMC

1              DEFENDANT CHEN:  No, thanks.

2              THE COURT:  All right.  Then I will ask you now as to

3      each of the charges against you, how do you plead:  Guilty or

4      not guilty?

5              As to Count One, Mr. Wang, guilty or not guilty?

6              DEFENDANT WANG:  Not guilty.

7              THE COURT:  Ms. Chen, guilty or not guilty?

8              DEFENDANT CHEN:  No.

9              THE COURT:  As to Count Two, Mr. Wang, guilty or not

10     guilty.

11             DEFENDANT WANG:  No.

12             THE COURT:  Ms. Chen, guilty or not guilty?

13             DEFENDANT CHEN:  Not guilty.

14             THE COURT:  As to Count Three, Mr. Wang, guilty or not

15     guilty?

16             DEFENDANT WANG:  No.

17             THE COURT:  As to Count Four, Mr. Wang, guilty or not

18     guilty?

19             DEFENDANT WANG:  No.

20             THE COURT:  And as to Count Five, Mr. Wang, guilty or

21     not guilty?

22             DEFENDANT CHEN:  No.

23             THE COURT:  Ms. Chen, guilty or not guilty?

24             DEFENDANT CHEN:  Not guilty.

25             THE COURT:  All right.  I'd like an update from the

OBI4HUMC

1    government as to discovery.

2            MR. SULLIVAN:  Yes, your Honor.  Discovery is

3    substantially complete.  The last few productions have been of

4    the nature of jail calls and summary translations of those jail

5    calls to the individual, produced to the individual defendants.

6    I think most recently on November 14, we produced a two-page

7    production where we had discovered a prior document had a blank

8    page in it, so we reproduced that.

9            We were last before the Court on July 25th.  What we

10   were in the midst of doing at that time was producing, from the

11   devices, material that we deemed responsive to our warrants.

12   We have continued since July to do that on a rolling basis, and

13   I don't anticipate any meaningful production of material from

14   the devices at this point, given what we produced to date,

15   which has been substantial.

16           THE COURT:  All right.  Do the defense lawyers have

17   any complaints about discovery they would like me to hear about

18   today?

19           MR. ALDRIDGE:  No, your Honor.

20           MR. KIRTON:  Yes, your Honor.  My client has not been

21   able to review the discovery on the MDC computer in the old

22   building, the female building.  The discovery coordinator sent

23   her copies of the two cell phones and the laptop computer.  She

24   was not able to look at any of those discs we sent to her.  I

25   sent her my copy.  She still could not open up that drive.  The

OBI4HUMC

1    government sent a copy that I sent to my client.  She was able

2    to open up only the PDF documents and nothing else.  We had

3    some discussions with the government about this.  They have

4    been accommodating as much as they could, but at this point I'm

5    going to make an application for a laptop to be sent to

6    Ms. Chen so she could review the entirety of discovery.  I

7    don't know what the government's position is but they done all

8    they could do to give her all the discovery she is entitled to

9    and she still could not open up and review all of the discovery

10   in this case.

11           THE COURT:  Mr. Sullivan, have you attempted to

12   address this problem.

13           MR. SULLIVAN:  Yes, your Honor.  So Mr. Kirton had

14   previously advised us of some issues, I think as the Court was

15   also well aware at prior conferences, of some issues with the

16   computers at MDC.  We were in communication with MDC back in

17   October regarding some of these issues.  We also produced to

18   the defendant, because there was some thought that, perhaps, it

19   was the large phone extractions that were on these drives that

20   might be making things difficult just to open the drive or

21   somehow corrupting files.  So we, in fact, then in October

22   reproduced to the defendant, to Ms. Chen, every single

23   production we made to date with the raw phone extractions

24   stripped out so if that was the potential problem, we could

25   eliminate that.

OBI4HUMC

1          We understood after that production, I believe

2    Mr. Kirton informed us, that the defendant was having issues

3    opening txt files and Excel files.  So we went back to MDC to

4    learn more about what their system supports.  We got the

5    supported file formats from MDC.  Excel and txt files are

6    supported, PDFs are supported.  The Microsoft Suite is

7    supported.  It sounds like there might be an issue with the

8    phone extractions.  Perhaps that's the sole issue.  We

9    obviously have produced responsive PDF sets and machine

10   translation sets of what we have been pulling off of the

11   phones.  So we understand, from Mr. Kirton, that PDFs are not

12   an issue to open within the jail.

13          If it's the phone extractions themselves, those images

14   of the devices.  We are not confident that a laptop would

15   necessarily solve that problem.  We can't open them on our own

16   laptops.  We have to use a stand-alone desktop computer.  These

17   are very large device images.

18          In terms of any specific issues that Ms. Chen is

19   having, we have advised that those are typically raised with

20   the unit head.  We don't know if that's been done.  But we've

21   tried everything we can to troubleshoot it.  We don't think

22   laptop is necessarily the answer here.  It sounds like she is

23   able to review the balance of discovery.  I think apparently

24   it's the raw extracts of the devices that's at issue, but we

25   have been are producing the responsive sets from those devices

OBI4HUMC

1   of the material that we deem responsive to warrants and

2   relevant to our case in chief.

3         That's where we are.  I'd like to earn a little bit

4   more from defense about the particular issues that still

5   remain, but we don't think a laptop is necessarily going to

6   solve a problem.  We also understand the computers are

7   relatively knew.  They were placed within the last few months

8   within are her unit, so it's not like these are ancient devices

9   that's been with the government for years.

10        THE COURT:  Mr. Kirton?

11        MR. KIRTON:  Your Honor, I think the issue is

12  capacity.  Other than the PDF documents, the computers at the

13  MDC -- I know they are new -- cannot download any other

14  documents.  There is just not enough capacity in those machines

15  to review the other documents.

16        She raised this issue with a unit manager on a number

17  of occasions.  The response to my client was, "ask the Court to

18  give her a laptop."  That was the response.

19        The only discovery she has been able to review in full

20  was the very first set, which was turned over in 2023.

21  Everything after that, she's not been able to download the

22  entirety of the production.

23        So I think that's my understanding of the problem.

24  The issue was raised to the manager, and that was her response

25  to my client, "get a laptop."

OBI4HUMC

1          THE COURT:  Well, the Assistant just told us that he

2     can't open the files on his laptop.  So it seems unlikely that

3     if we give Ms. Wang a laptop she is going to have any better

4     luck.

5          MR. KIRTON:  Well, I think I can open it on my laptop.

6     First of all, I spoke with Mr. Aldridge about this.  He

7     recommended we contact the data mill to see if they have a

8     compatible laptop.  I've spoken to the coordinator, David Davo.

9     He's indicated to me that he has laptops available to give to

10    the MDC with the government and the Court's permission.

11         THE COURT:  Mr. Sullivan, will need to do this.  I

12    can't afford any delay.  I don't know if it's going to work but

13    I want a report back from you guys in a week as to whether we

14    made progress on this because I'm concerned.

15         Mr. Sullivan, can you make this happen?

16         MR. SULLIVAN:  I will have to talk to MDC.  It's not

17    up to the government, but we will relay everything that has

18    been conveyed here in the Court to the folks at MDC, and we

19    will do our best.

20         So the record is clear, after that production of

21    everything, we were led to believe by Mr. Kirton that the only

22    remaining issues other than the phone extracts were any Excel

23    files or txt files.

24         To give your Honor a sense, the balance of discovery

25    is in large part in PDF format.  So I don't think it's been

OBI4HUMC

1   sitting around unreviewed by Ms. Chen if she is able to open

2   PDFs.  The government understands the Court's concern,

3   appreciates it, and we will go to MDC and do the best we can.

4       THE COURT:  If the lawyers need any orders from me or

5   anything else I can do, you can let me know.  You are going to

6   send me a letter in a week's time telling me where we are.  If

7   we are not in a good place, I will put it down for another

8   conference because I'm concerned.

9       Any other issues you want to raise, Mr. Kirton?

10      MR. KIRTON:  The medical issues have been essentially

11  resolved.  The headache issue has been resolved.  The issue

12  with persons in her unit smoking has been resolved.  Those

13  persons have been removed from that unit.  There was also

14  another issue that came up, maybe about three weeks ago.  It

15  involved her A1C level being very high, that's also been

16  resolved recently as well.

17      The only outstanding issue is she is having daily nose

18  bleeds.  She still gets nose bleeds every morning at the MDC.

19  After the Court signed the order that I submitted, she received

20  medical attention and was given, I guess, the opportunity to

21  purchase a nasal spray.  She purchased that spray, but it was

22  actually expired.  She's still using the spray, but it still

23  has not worked.  So she still gets nose bleeds in the morning.

24  I'm in contact with my client about how to resolve this.  Quite

25  frankly, I'm not confident she can get this issue resolved at

the MDC.  But I don't think my client wants to leave the MDC

for a number of reasons.  I will notify the Court if I need to

notify the Court.

My only other application would be to have her removed

from the MDC to another facility in order to get her medical

treatment for the nose bleeds.  That's basically the only

outstanding issue in terms of the medical treatment.

THE COURT:  Well, I want the problem addressed.  My

hope is it can be addressed at the MDC.  But, Mr. Sullivan, if

it can't be addressed at the MDC, I'll have to consider whether

it's necessary to move the defendant.  So can you intercede

with the medical staff there and find out what can be done to

help Ms. Chen problem with the nose bleeds?

MR. SULLIVAN:  Yes, your Honor.

THE COURT:  Is there any thought, Mr. Kirton, as to

what is causing this?

MR. KIRTON:  Not sure, your Honor.  I spoke to her

about this.  She did not have this problem at home in China.  I

think it -- I think she was told that the air is fairly dry in

New York.

THE COURT:  That's what it sounds like.

MR. KIRTON:  But I don't really know.

THE COURT:  So Mr. Kirton, in that letter that the

lawyers are going to send me a week's time, I want to you tell

me what progress you made on the nose bleed problem.

OBI4HUMC

1          And Mr. Sullivan, you will include in the letter the

2   efforts you've made to address it.  Okay?

3          MR. SULLIVAN:  Yes, your Honor.

4          THE COURT:  Anything the lawyers want to raise with me

5   before I turn to the pretrial motion that have been filed?

6          MR. SULLIVAN:  Your Honor, I'm happy to hold off until

7   you are done with the pretrial motions.  With respect to a few

8   additional or I guess one additional scheduling date, the

9   government has turned over expert notices.  We turned over a

10  number of expert notices on November 8 and a final expert

11  notice on November 14.  We've discussed with defense that they

12  notice any experts they intend to offer at trial by

13  December 4th, and we respectfully request that the Court enter

14  a scheduling order to that effect.

15         THE COURT:  Mr. Aldridge, do you intend to offer any

16  expert testimony?

17         MR. ALDRIDGE:  Perhaps.  I can't represent to the

18  Court that is going to happen with certainty.  We are trying to

19  secure experts, and we conveyed to the government that

20  December 4th would be the best date for disclosures.

21         THE COURT:  Okay.  What about you, Mr. Kirton?

22         MR. KIRTON:  Possibly.  I think both sides, both

23  counsel have an interest in the chemist, certainly, to consult,

24  possibly to testify.  I could just speak to my efforts.  There

25  was a list of chemists on the CJA website.  I called all of

OBI4HUMC

1    them.  No one has called me back.  I do have a separate

2    reference book that I could use for an expert who can consult.

3    I think we both have an interest in trying to get a chemist in

4    this case.

5              THE COURT:  Are you uncomfortable with the November 4

6    date that the government mentioned?

7              MR. KIRTON:  No, your Honor.

8              THE COURT:  I will issue an order providing discovery

9    defense expert materials by December 4th.

10             I would ask the government to give me a copy of

11   whatever disclosures have been made so far to the defendants so

12   I have an understanding of what's coming down the pike.

13             MR. SULLIVAN:  Yes, your Honor.

14             THE COURT:  Anything else before I turn to pretrial

15   motions?

16             MR. SULLIVAN:  Not from the government.

17             MR. KIRTON:  No, your Honor.

18             MR. ALDRIDGE:  No, your Honor.

19             THE COURT:  Defendant Wang filed pretrial motions.

20   They are on the docket at No 76 to 77.  Defendant Wang has

21   moved for a severance from Defendant Chen on grounds of

22   mutually antagonistic defenses.  See, Wang severance brief

23   Docket No. 76 at page 2.

24             Wang asserts that his defense will include "his lack

25   of knowledge, a dearth of *mens rea* about the transactions, and

OBI4HUMC

1    conversations that Yang held with a confidential source.  And

2    about the full context of the conversations that Ms. Chen

3    incompletely or selectively translated."  *Id.* at page 5.

4        Wang also says that he, "expects that Ms. Chen's

5    defense will include arguments to the effect that she was just

6    translating the conversations between Mr. Wang and confidential

7    sources or just following orders from Mr. Wang, who was

8    supposedly higher up in the ladder than her."

9        Wang goes on to say that Chen "will, more likely than

10    not, point the proverbial finger against Mr. Wang, creating

11    antagonistic defenses that will defeat Mr. Wang's rights to due

12    process and a fair trial."  *Id.*

13        The government argues that Wang's severance motion

14    should be denied because "Wang and Chen are indicted together

15    and are alleged to have participated in a common scheme and

16    plan."  And the Second Circuit has repeatedly rejected "finger

17    pointing" as a basis for a severance.  Citing the government's

18    opposition Docket No. 82 at page 23.

19        As to the legal standards for joinder and severance,

20    Federal Rule of Criminal Procedure 8(b) provides that two or

21    more defendants may be joined in a single indictment, "if they

22    are alleged to have participated in the same act or transaction

23    or in the same series of acts or transactions constituting an

24    offense or offenses."  Citing Federal Rule of Criminal

25    Procedure 8(b).

1          Joinder of defendants in multiple-count indictments is

2     proper where the charged conduct is "unified by some

3     substantial identity of facts or participants or arises out of

4     a common scheme or plan."  Citing *United States v. Attanasio*,

5     870 F.2d 809 at 815 (2d Cir. 1989).

6          Joinder may be appropriate even where a defendant is

7     not charged in a main conspiracy count naming another

8     defendant.  Citing *United States v. Rittweger*, 524 F.3d 171 at

9     177 to 178 (2d Cir. 2008).

10          The Second Circuit stated that joinder is proper when

11    "common factual elements" of different charges are readily

12    apparent.  Citing *United States v. Turoff*, 853 F.2d 1037 to

13    1044 (2d Cir. 1988).

14          Thus "counts may be connected if one of the offenses

15    depends upon or necessarily leads to the commission of the

16    other or if proof of one act constitutes or depends upon proof

17    of the other."  Citing *United States v. Shellef*, 507 F.3d 82 at

18    98 (2d Cir. 2007).

19          Similarly, where one offense stems from another that

20    may "provides a second basis for joinder under Rule 8(b).

21    Citing *Turoff* 853 F.2d at 1044.

22          Finally, where two charged conspiracies are

23    "intertwined" with each other, they are sufficiently related to

24    justify joinder.  Citing *Attanasio*, 870 F.2d at 815.

25          Rule 14 of the Federal Rules of Criminal Procedure

OBI4HUMC

provides, however, that even where joinder is proper under Rule

8(b), a Court may grant severance "if the joinder of offenses

or defendants in an indictment appears to prejudice a defendant

or the government."  Citing Federal Rule of Criminal Procedure

14.

In order to prevail on a severance motion under Rule

14, however, a "defendant must show not simply some prejudice,

but substantial prejudice."  Citing *United States v. Sampson*

385 F.3d 183 at 190 (2d Cir. 2004).

A defendant has the "extremely difficult burden" of

showing that he would be so prejudiced by joinder that he would

be denied a fair trial.  Citing *United States v. Casamento*, 887

F.2d 1141 at 1149 (2d Cir. 1989).

It is not enough for a defendant to show that he "may

have a better chance of acquittal in a separate trial."  Citing

*Zafiro v. United States*, 506 U.S. 534 at 540 (1993).

Instead, "a district court shall grant a severance

under Rule 14 only if there is a serious risk that a joint

trial would compromise a specific trial right of [a defendant]

or prevent the jury from making a reliable judgment about guilt

or innocence."  *Id*. at page 539.

Even in those rare instances where a defendant

establishes a "high" risk of prejudice, "Less drastic measures,

such as limiting instructions, often will suffice to cure any

risk of prejudice."  *Id*.

OBI4HUMC

1          The Second Circuit has noted that "the principals that

2     guide the district court's consideration of a motion for

3     severance usual counsel denial." citing *United States v. Rosa*,

4     11 F.3d 315 at 341 (2d Cir. 1993).

5          As I noted at the outset, Wang's motion is premised on

6     alleged mutually antagonistic defenses.  Wang says that he had

7     "zero authority over the company"  was subordinate to other

8     company figures and was "called in as a substitute" for

9     codefendant Yang to attend the meetings which led to his

10    arrest.  Citing Wang's severance brief, Docket No. 76 at pages

11    4 to 5.

12         He also says that Ms. Chen was "assigned" to attend

13    the same meetings as a translator.  *Id.* at page 5.  Wang

14    speculates that "Ms. Chen's defense will include arguments to

15    the effect that she was just translating the conversations

16    between Mr. Wang and the confidential sources or just following

17    orders from Mr. Wang, who was supposedly higher up in the

18    ladder than her."  *Id.*

19         But it is mere speculation what Ms. Chen's defense

20    will be at trial.  And speculation cannot provide a basis for a

21    severance.  "Defenses are mutually antagonistic when accepting

22    one defense requires that the jury must, of necessity, convict

23    a second defendant."  Citing *United States v. Yousef*, 327 F.3d,

24    56 at 151 (2d Cir. 2003).

25         "Mere finger-pointing" among codefendants "does not

OBI4HUMC

require severance" however.  Citing *Casamento* 887 F.2d at 1154.
And even "mutually antagonistic defenses are not prejudicial
*per se*."  Citing *United States v. Haynes*, 16 F.3d 29 at 32 (2d
Cir. 1994).  Instead a defendant must show that antagonistic
defenses will result in prejudice such that "there is a serious
risk that a joint trial would compromise a specific trial
right."  Citing *Zafiro*, 506 U.S. at 539.

Moreover, "Rule 14 does not require severance even if
prejudice is shown.  Rather, it leaves the tailoring of relief
to be granted, if any, to the district court's sound
discretion."  Citing *Yousef* 327 F.3d at 151.  "It is well
established that a court can cure prejudice caused by allegedly
antagonistic defenses through the use of jury instructions."
Citing *United States v. Hameedi*, 2017 WL 5152991 at *5
(S.D.N.Y. Nov 3, 2017).

Here, Defendant Wang has not set forth mutually
antagonistic defenses, nor has he demonstrated that he will
suffer prejudice to a specific trial right if a severance is
not granted.  A jury could, for example, accept Chen's defense
that she was merely translating at the meetings and following
orders and still acquit Wang due to his alleged lack of *mens
rea*.  And to the extent that Wang intends to argue that a more
senior executive at Hubei was the real source of authority, and
that this executive sent Wang and Chen to the meetings, due to
Codefendants Yang's unavailability.  Both Wang and Chen could

simultaneously pursue that defense.  Even if Chen were to

"point the finger" at Wang, "the mere fact that codefendants

seek to place the blame on each other is not the sort of

antagonism that requires a severance."  Citing *United States v.*

*Villegas*, 899 F.2d, 1324 at 1346 (2d Cir. 1990).

          Indeed, courts routinely deny severance motions

premised on such "finger-pointing" arguments.  In *Zafiro*, for

example, two defendants argue that a severance was necessary

because they "both claim they are innocent and each accuses the

other of the crime."  Defendants argue that absent of

severance, the "jury will conclude, one, that both defendants

are lying and convict them both on that basis; or, two, that at

least one of the two must be guilty without regard to whether

the government has proved its case beyond a reasonable doubt."

Citing *Zafiro* 506 U.S. at 540.

          In ruling that a severance was not warranted, the

Supreme Court stated that "even if there were some risk of

prejudice, here it is of the type that can be cured with proper

instructions." *id*.  The same reasoning applies here.  To the

extent Wang intends to argue at trial that he was duped by

Chen's "selective; translations."  See Wang's Severance Brief

Docket No. 76 at page 5.  That type of "finger-pointing"

defense provides no basis for severance.  See, for example,

*Cardascia* 951 F.2d at 485 to 486 (defendants claim that he was

"duped by the codefendants."  "Plainly is typical of

OBI4HUMC

coconspirator trials and does not warrant severance.")

Also, *United States v. Louis*, 2018 WL 6241445 at *2 through 4 (S.D.N.Y. Nov. 29, 2018).  Denying a severance motion where Defendant A claim "that he was duped by" Defendants' B and C, while Defendant B "stated that he was used and victimized by "Defendant A" because "numerous courts have rejected what has been called, in common parlance, the finger-pointing argument.")

The cases Wang cites, see Wang Severance Brief Docket No. 76 at pages 3 through 4, are not to the contrary because they involve circumstances in which a jury could not accept one defendant's defense without rejecting the other defendant's defense.  See *United States v. Basciano*, 2007 WL 3124622 at *8, (E.D.N.Y. Oct. 23, 2007).  Serving a defendant in a capital trial because "to the extent that the jury believes [one defendant's] defense that he rescinded the hit on Pizzolo and [the other defendant] reordered it, the defenses are more than merely inconsistent, they are in direct conflict.")

Also, *United States v. Copeland*, 336 F. Supp. 2d 223 to 224 (E.D.N.Y. 2004).  (Granting severance where one defendant argued that "he was not involved in the bank robbery" while the other planned to introduce evidence that it was the first defendant, who "entered the bank to commit the robbery.")

Accordingly, Wang's motion for severance on the grounds of mutually antagonistic defenses is denied.

OBI4HUMC

1          Wang has also moved to strike the first two paragraphs

2     of the indictment as "unnecessary," "irrelevant," and

3     "prejudicial" surplusage.  Citing Wang's motion to strike,

4     Docket No. 77, page 2.

5          The first two paragraphs of the S1 indictment

6     discussed the deadly nature of fentanyl, the number of

7     Americans who have died from it and the massive seizures of

8     fentanyl that have taken place in the United States.  See the

9     S1 indictment, Paragraphs 1 through 2.  While we now have a

10    superseding indictment, there is no change in the first two

11    paragraphs.  Accordingly, I will rule on Wang's motion to

12    strike even though it is addressed to the original indictment.

13    It is not my practice to give "speaking" indictments such as

14    the S1 indictment to the jury or to read speaking indictments

15    to the jury.  I do not intend to vary from my standard practice

16    in this case.  Accordingly, I'm denying Wang's motion to strike

17    as moot.

18          We do have a schedule trial date of January 13, 2025.

19    We do have an exclusion of time through the trial date.  I am

20    going to set a final pretrial conference for January 10, 2025,

21    at 10:00 a.m.  Although, I may well see you before then, I want

22    to emphasize to counsel that I'm available to you at any time

23    if you feel that a conference is necessary.

24          As to motions *in limine*, proposed *voir dire*, proposed

25    request to charge, they will be due on December 13, 2024, with

OBI4HUMC

1    responsive papers due on December 20, 2024.  These dates were

2    previously provided in my April 8, 2024, order which is Docket

3    No. 59.

4            Is there anything else on behalf of the Court at this

5    point?

6            MR. SULLIVAN:  No, your Honor.  Thank you.

7            THE COURT:  Mr. Aldridge?

8            MR. ALDRIDGE:  No.

9            THE COURT:  Mr. Kirton?

10           MR. KIRTON:  No, your Honor.  Thank you.

11           THE COURT:  Thank you all.  We are adjourned.

12           (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25